Can I please the court? I'm Frank Coughlin. I represent Ms. Louise Parth, the appellant. This is, bar none, the most important FLSA case that I believe has occurred in 60 years. That's a heavy statement. It is also a true statement. If the pay plan in question here, Pomona Valley's pay plan, is affirmed as legal, if the district court's ruling on summary judgment is upheld, this will spark a change in the application of the FLSA and dilute its policies nationwide. How so? As a hypothetical, to answer your question, Your Honor, any employer, under this ruling, any employer can go to its employee or employees and say, I would like you to work or change from a regular schedule of 40 hours per week to 60, and I'm going to lower your rate so that your gross wages remain the same. On paper, overtime is paid. On Pomona Valley's calculator, overtime is paid. But its payroll bank account is immunized. So what's wrong with that? As long as there was not a violation of the Fair Labor Standards Act in the beginning, as long as people were being paid higher than the minimum wage and were being paid overtime, what's the violation of the law? The violation of the law is based in Youngerman, the Supreme Court decision of Helmerich, also on Weddington and York, and ultimately a district court opinion of Rhodes, which say Of those cases, which is the very strongest case for the proposition that you're arguing towards? The Supreme Court case of Youngerman mandates a reversal of the grant of summary judgment by the district court. What's the language in Youngerman that you're relying on to say that this categorically was a violation of the Fair Labor Standards? Tell me the language. I would point to two quotes. The first is that you cannot pay a rate of pay for overtime hours worked that is less than one case for a non-overtime, a regular non-overtime shift. In our case, there are eight-hour employees. There are 12-hour employees. Twelve-hour employees are not generally scheduled to work eight-hour shifts. But the policies and the contracts that Pomona has allows 12-hour shift employees to transfer to eight-hour shift employees. I have the Youngerman case. I want you to tell me exactly the language that you're relying on, not the principle, the language. The regular, this is on page 424. Right. As we have previously noted, the rate, there are two quotes. As we have previously noted, the regular rate refers to the hourly rate actually paid the employee for the normal, non-overtime work week for which he is employed. Right. Where's the prohibition in that language? You said that the case says that you cannot establish a different rate. So where's the prohibition in that language? Later in that same page, this freedom of contract, the freedom to set rates, does not include the right to compute the regular rate in an unrealistic and artificial manner. Correct. Later on page 426, the Court concludes that the lower rate the employer in Youngerman purports to pay, that is 35 cents, does not constitute the hourly rate actually paid for the normal, non-overtime work week. What do you do with the language in the case that says, as long as the minimum hourly rates established by Section 6 are respected, the employer and employee are free to establish this regular rate at any point and in any manner they see fit? Youngerman states that very principle with a qualifier, which is that freedom of contract does not include the freedom to set the rate in an artificial and unrealistic manner. Later cases, Weathington and York both say that rate reductions during the effective date of the FLSA would not be valid. The District Court decision in Rhodes says the same thing in concluding that a rate reduction to achieve cost neutrality is not valid. If this is allowed, it is not realistic for an employer to simply take an 8-hour rate and reverse engineer a new hourly rate to immunize its bank account from the payment of overtime. Okay, in Youngerman, what happened was the court looked at the stacker rate per 1,000 board feet that was stacked and said that if you divide that out by the number of hours, that it should be 59 cents per hour should be paid based on the stacking rate, but the company was going to pay 35 cents per hour. That's why the court said it was unreasonable. Now, I don't understand how you translate that to a division of the number of hours worked to get to an hourly wage in this case. Youngerman is on all fours with this case. In Youngerman, the court noted there was an audit, and the audit showed that before the rate manipulation, stackers were making 51 cents per hour. The employer said to the employees, your new hourly rate is now 35 cents an hour. Implicit in Youngerman is that that reverse engineering process, a rate reduction to achieve cost neutrality, is not valid. You're leaving out a step. In Youngerman, there was a division of the labor divided by the number of hours it took to get to that. The court finding that an artificial manipulation had occurred, looked at the workers' gross wages, divided them by hours worked. As a footnote, there was a cost of living increase during the course of implementing the pay scheme in Youngerman, and said that's what these people are being paid, that higher rate of, as the court says, 59 cents an hour. That's very simple. Not only is that case on all fours. Take it another step, which is there is something called each 12-hour shift employee in our case has an eight-hour rate, a higher rate of pay, which he or she is paid for all other forms of compensation. What are they paid if a 12-hour employee gets sick after eight hours and goes home? That person would be paid something called unplanned personal time off, which is a number that is- I'm not asking what they're paid for the four hours they didn't work. I want to know what they paid for the eight that they did. If that occurred, they would be paid at the lower rate of pay plus an amount of unplanned personal time off that's calculated at the higher rate to achieve basically a gross wage that equals, in my opinion, what the higher-basically a straight time rate. Could the employer now say, they're tough times, and we're going to hire more nurses, but we're not going to pay them as much. We're going to pay them at a lower rate yet, and we will give them time and a half after eight hours. Absolutely. Market adjustments, bona fide market adjustments are valid. But if a market adjustment occurs in a hospital for nurses, let's say clinical one nurses, based on hard economic times, if it's bona fide, one would assume that the rate of pay for those nurses is lowered across the board. Well, maybe not. I mean, I could understand an employer saying, okay, we're hiring more, but we just- I've got some obligations to my old employees. I don't want to lower their pay, but we just can't keep this up, so the new ones coming in are going to get paid less for the same work. That's the same fact. I agree with Your Honor, which is that's a bona fide market adjustment based on economic need, but that's not what happened here. They admit that they lowered those rates to achieve cost neutrality with respect to FLSA, and that's on page 34 of their answering brief. Now, the Supreme Court said that's okay to do that before the act takes effect. Absolutely. And why once the act takes effect wouldn't it become invalid? Exactly. That's a question. Why would it not become invalid? The Supreme Court says, well, you can do this kind of shuffle before the act takes effect, but once it takes effect and we know what you did, if it's unlawful now, why wouldn't we make them undo it as of the time the act took effect? I think because of precedent, both the Supreme Court and Congress, during the application of the FLSA to state and local governments, have acknowledged explicitly or implicitly that rate reductions before effective date are valid, period. This is a great, and that's I think a terrific point. Why would Congress, if rate reductions during the effective date of the FLSA were valid, why would Congress have to go to the trouble in 1985 of creating an express grace period so state and local governments could comply with the act in the best, most economic way, that is to reduce their rates? The fact that Congress had to install a grace period to allow governments to adjust to the application of the FLSA proves that rate reductions during the effective date of the FLSA are not bona fide. If these rate reductions are allowed, and it's not just a rate reduction, there are so many other pieces of evidence, points of evidence that point to artificiality in this case, and I won't list them again. They're listed in our brief. But if this is allowed, it will lay waste to the FLSA policy. An actual financial penalty will be gone. Payroll bank accounts will be immunized. There will be no additional pay for the burden of overwork. There will be no financial mechanism to force employers to spread employment, which is a key fact that must be considered in these difficult economic times. Council, what do we make of the fact that this pay adjustment was done at the request of the nurses to have 12-hour shifts and the fact that your clients specifically and the nurses generally agreed to this plan? What of what noticed that? In pay plans that had been struck in the past, like in Youngermen, the employees agreed. That wasn't relevant because you cannot, an employee and an employer cannot contract, even by CPA, around the application of the FLSA. But even that statement, I think it must be placed in the historical context. There was an election to go to 12-hour shifts in the mid-90s at Pomona, and the nurses voted against that transition by a minimum of 51% up to 66%. Fact number two, during the union negotiation process, the union said to Pomona Valley, we want to go to straight time. And Pomona Valley said no. And a deposition admitted there were no discussions about the rate changes. Pomona Valley simply came back nine months later and said, we like our pay plan, and that's what we're going to offer. And the union, yes, the union did agree. May I ask you a question? Yes. If you've finished with that answer. I would add only that Pomona didn't want to change because, and this is where it becomes both ironic and absurd, Pomona was concerned about actually incurring overtime if the nurses went to straight time pay. Let me ask you this question then. Do you have a case that says that an employer may not properly pay a basic hourly rate for work that's identical in nature but performed during different shifts of different lengths? I believe that. Do you have a case? Yes. What? I believe that. I mean, that's the bottom line. Do you have a case that says that an employer may not give a different base hourly wage rate for work that's identical in nature but performed during shifts of different lengths? Youngerman says that. Well, this is not a case where the FLSA has been at all violated by the amount paid. This is just a case where an employer employs one person at one rate and one for another. They may do the same job, but they perform different shifts at different lengths of time. There's a key distinction there, different shifts at different lengths. The FLSA doesn't and never has regulated whether an employer can pay someone more money for working the graveyard shift or a holiday or a weekend. It does, however, regulate whether an employer can pay less for overtime shifts. That principle is, I think, implicitly invoked in Youngerman, and it's also in the Code of Federal Regulations 778.316. It says just that, which is when the employer and the employee agree on a particular rate for a particular type of work, that rate of pay cannot be lower. Counselor, you've exceeded your time. We'll give you a minute for a vote. Thank you very much. May it please the Court, my name is Douglas Hart for Sheppard Mall in Northern Hampton on behalf of Pomona Valley Hospital Medical Center. I think you can see that the logical extension of counsel's arguments are basically that if you have an employee who is eligible for overtime, under the appellant's point of view, an employer could never reduce that employee's wages. That's the logical extension. Well, can they do this? Can they say, when you come to work in the morning, you decide whether you're going to work eight or ten hours today. And if you're going to work ten hours, we're going to start you with a lower rate of pay. But if you come back the next day and say you're going to work eight, we'll pay you more. That's not this case. That's not my question. Would that violate the Act? If I come in today and say I'm going to work ten hours today. So if you say that, I'm going to lower your pay. Because the last two hours are going to be time and a half, and I don't want to pay more per hour than I'm paying you for an eight-hour day. That system probably would not be allowed. Isn't that what happened here, except it was just done en masse? Absolutely not. If these people take a different shift, if they work on their day off for eight hours, they're paid a higher rate. That's not correct. These people are hired as 12-hour nurses. They are paid a 12-hour rate. They are not paid extra work. Counsel miscites the record when he says if they get sick and go home, they get extra compensation. They don't. They are paid the lower 12-hour rate if they work four hours on a day, if they work five hours on a day, if they work eight hours on a day, if they work ten hours on that day, or if they work 12 hours on that day. If they work above eight, they're paid overtime on that lower rate. I think your point is, I'm trying to help you out, is that the difference between this situation and the hypothetical Judge Canby gave is that would not be a regular rate of pay because you would come in every day and decide what the rate of pay would be, whereas here it's regular because it doesn't change depending on the day. The rate is the rate regardless of how many hours of work. That is correct. The rate is their rate of pay for their hours. The only time they get a different rate is if they come in on what's called an extra shift. And the regulations provide that an employer can incentivize employees to come in on an extra shift. And when they come in on that extra shift, not their regular shift, they know when they come in on their regular shift they are getting their 12-hour rate of pay. That extra compensation is factored into the regular rate, as the district court discussed, and we get a weighted average regular rate, which is exactly what the FLSA prescribes and the regulations prescribe. Let me ask you this. The cases seem to say that if the wages are lowered prior to the effective date of the FSLA, that's okay. Why wouldn't the inverse be true, or the converse be true, that if it's lowered after the effective date of the FSLA, it's illegal? Because, number one, in the cases, no case says that. Right. And if we go back to the Seminole case, which is Walling v. Belo, what the court cautioned in that case was that the court should give credit to the agreement between the parties. What the parties agree to is the wage rate, unless to do so would violate the act. What is that language telling us? Why is that language there if it doesn't mean anything? I mean, the courts consistently said this is okay because it was done prior to the effective date of the FLSA. What do we take that to mean? You take it to mean – let me give you an example from the case. What the cases say is that an employer is free to negotiate a wage rate with its employees as long as the minimum wages are satisfied, as long as, number two, the regular rate is properly calculated, and number three, it's not – there is no artificiality as to the calculation of the regular rate. Okay. The case is, if we go to Wethington, what Wethington said was when the city first calculated that regular rate, they inflated the number of overtime hours worked to get to that regular rate. And the court said, you know, had the statute been in effect, that calculation of the regular rate wouldn't have been legal because it was based on this fiction of increased hours. However, the Eleventh Circuit also says – they don't say what counsel says. It says at page 228 that rather than using these calculations, the city could have reduced the wage rate to a level it contemplated would produce a total wage equal to the former wage. So the court is saying if the city had done what the hospital did in this case, and that is just come up with a regular rate and offer it to the employees, and the employees accept that regular rate, and that regular rate is paid for every hour worked, and overtime is paid for the actual overtime hours worked, and it is based on that regular rate, which is properly calculated under the FLSA, then that would not have violated the statute. In your view, how is a regular rate properly calculated under the FSLA? You take all of the remuneration earned by the employee in that work week. You add it up and divide by 40. You come up with a regular rate and apply time and a half for the hours over. In this case, because we're talking about the 8 and 80 schedule, you apply that regular rate, time and a half that regular rate to hours over 8 in the day or over 80 in a two-week work period. And if you look at the district court's decision, the district court goes through an exhaustive breakdown of how Mrs. Parth was paid and concludes that under the regulations, Mrs. Parth, the regular rate was properly calculated, and she was properly paid overtime based on that properly calculated regular rate. Does the record indicate that any of the 12-hour employees occasionally worked more than 12 hours? Not in one day. If a 12-hour shift employee – yes, if they do, they are paid. Do they have overtime over their overtime? Has that happened? Yes, it happens, in which case they are paid, because they're on the 880, if they work over 12 hours a day, they are paid double time that regular rate, which is consistent with the regulations for this 8 and 80 work schedule. Counsel, do you agree with opposing counsel that this is the most important labor law case in the last 50 years? I don't even think it's a close case. I think that's a gross overstatement. No, I don't agree with that. I have trouble even contemplating that. I think if, as the district court concluded, these RNs were properly paid, the regular rate was properly calculated, there was no artificiality in the calculation of the regular rate. This is not Youngerman. Youngerman talked about how many boards they loaded on the ship and they were paid for how many board feet they loaded. They were paid a piece rate. And what Youngerman said is the statute says employees get overtime after 40 hours in a work week. So you have to devise a system whereby employees are paid overtime after they work 40 hours. In this situation, the statute allows the hospital to use the 8 and 80 schedule, whereby employees are paid overtime after 8 hours in a day or 80 hours in a 2-week work period. That's exactly how the hospital pays these employees. They are paid a rate, they earn that rate, the regular rate is calculated, and they're paid overtime on that regular rate. If I understand the opening statement of your opponent, it's that you take an employer who, let's say, during the construction season, is working people six days a week or something like that, or even seven, and paying a lot of overtime, and it's getting pretty expensive. So he calls all his workers and says, Well, I'm reducing. I'd rather be paying you straight time. So what I'm going to do is reduce your ordinary rate so that, in effect, I'll be paying straight time what I would have paid in the old days for the 40-hour week. Now I'm going to stretch it over a 48- or 56-hour week. So your pay is all reduced. Your regular pay is reduced. I'll continue to work you seven days a week, but it won't cost me any more per hour than it used to cost to work you 40 hours. I mean, will there be a huge incentive to do that if this is okay? Will there be? No. No. What will happen to those employees? Those employees, the company next door who is paying the higher rate, those employees will migrate to the next company. That's true in good times. That's true in good times. Maybe nobody is working overtime now anyway. Well, in bad times, in the situation we're in today, if we follow that thought to its logical conclusion, what you're saying is if an employer comes to the conclusion that I can't pay $12 an hour if you are working 60 hours a week and making overtime after 40 hours a week. I just can't afford it. My business is down and so forth. So I have a choice. Employees come here. I have a choice. We can say we can reach a new arrangement as to wages, and I will pay you $10 an hour, and I will pay you overtime any overtime hours you work over 40. So, you know, we usually work 50 hours a week, but next week if we work 60, you still get the benefit of this overtime rate. You still get the benefit of the bargain. But the regular rate is lower. Is that what you're saying? We're going to agree that your base rate instead of $12 an hour is $10 an hour because I think I can make this business work for $10 an hour. And the employees say, you know, in these hard times, that makes sense. I'd rather make $10 an hour and keep my job because the alternative is the employer will say, or I have to lay half of you off. And we know the employer could lay them off. So if the employer could reduce their wages to zero. Or the employer might just say, we're not going to have overtime then. I'll pay you your old rate, but I just can't work overtime. That's an option for the employer, and that depends on the exigencies of the job. If it's this type of job, I mean, it's difficult. The beauty of that, of course, is that the design of the Act probably was to encourage that result so that more people would be hired. That is not the only purpose of the Act, and the Act does not restrict the number of hours of overtime an employee can work. If that purpose of the Act was so fundamental to the Act, the Act could have restricted the number of overtime hours. Or the Act could have said, you're not going to work overtime hours. Instead, the Act doesn't. The Act simply says, if you're going to work overtime hours, then, employer, you have to pay the employee for those overtime hours, and you have to pay that employee properly. You can't make a fiction. You can't inflate the number of overtime hours at a work or the number of regular hours. You can't have a split payday like the hemorrhage case. You can't come up with some artificial way to pay. You have to pay the regular rate for the hours worked, and that's exactly what the hospital has done here since these rates were implemented. And I would say, in this case, remember, the nurses came to the hospital. There was a paradigm shift in the nursing industry and the health care industry in the early 1990s. The nursing shortage was starting. This is not a situation where the employer was trying to take advantage of the nurses. The nurses were taking advantage of their economic power by way of this sort of the start of a nursing shortage. And they came to the hospital and said, we want more flexibility in how we do our job. The counsel, you would agree that if it violates the law, it doesn't matter if the nurses approach the hospital or if they agree to it. If it violates the law, it violates the law. Absolutely. Absolutely. And that's why, in this case, the employer bent over backwards to not violate the law. The employer came to an agreement. They had meetings. They met with the nurses. The nurses accepted this scheme. The fact that an election was held and was rejected goes to a different type of 12-hour shift that is not germane to this situation. The nurses agreed. And then the nurses were represented by the Service Employees International Union, the largest union in the United States, and agreed to this system of payment in a collective bargaining agreement. And the actual facts of that, Mrs. Parth was on the bargaining committee, and she testified, and it's in the record, that the nurses didn't, the nurses wanted the scheme. They wanted the way the hospital was paying 12-hour shifts. They wanted the 8 and 80 schedule because it gave them more flexibility. All right. Thank you, counsel. You've exceeded your time. Thank you. One minute for rebuttal, please. Thank you, Your Honors. Counsel, in some respects, has just made our case. Employees who don't like the rate reduction will migrate. Well, that assumes a job market and availability. The reality in this environment is economic. There will be subtle economic coercion, which will prevent people from fighting against these programs, and there really isn't legitimate opportunities in the market to simply say, okay, I'm leaving, and I'm going to go across and get a better rate. Is that true for nurses? I don't know. And has that been true the entire time? I don't know that there's any facts right now in the record that would say one way or the other, but this case is much bigger than nurses. This case affects factory workers, farm workers, garment workers, our own children who work in summer employment jobs and college. Let me go back. Mr. Counsel for Pomona Valley said if an employee agrees to the lower rate, they will still get the quote, the benefit of the overtime pay on that. What benefit? That's an illusion. The fact is that the bank account of Pomona Valley, the payroll bank account of Pomona Valley, and any other employer who decides to use a program like this will remain status quo. Third, Counsel for Pomona Valley suggests that bad things could happen. If the people don't, if nurses don't agree or employees don't agree to a lower rate, there will be layoffs. Nonsense. It's exactly what the FLSA was intended to do, which is to force, through an economic leverage, force employers to spread employment, never as important as it is in these times. This order. Thank you, Counsel. Thank you. You've exceeded your time. Thank you to both counsels. The case just argued is submitted for decision by the court. The next case on calendar for argument is Shroyer v. New Singular Wireless Services.
judges: Canby, Rawlinson, Smith N. R.